UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEITH KUHN,

     Plaintiff,

v.

HEALTHCARE INFORMATION, LLC,
and SHEAKLEY HR, LLC d/b/a
SHEAKLEY HR SOLUTIONS,

     Defendants.

_____/

Case No. 13-cv-12652
Hon. Matthew F. Leitman

## AMENDED OPINION AND ORDER (1) GRANTING DEFENDANT SHEAKLEY HR, LLC'S MOTION FOR SUMMARY JUDGMENT (ECF #49) AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT HEALTHCARE INFORMATION, LLC'S MOTION FOR SUMMARY JUDGMENT (ECF #48)[1]

## INTRODUCTION

Defendant Healthcare Information, LLC ("HCI") sells televisions and other entertainment systems to hospitals. In May 2012, HCI hired Plaintiff Keith Kuhn ("Kuhn") as a regional sales manager. HCI paid Kuhn a base salary plus commissions on certain HCI sales. Not long after HCI hired Kuhn, its sales slowed. In January 2013, HCI addressed the downturn by reorganizing its sales force, eliminating the regional sales manager position, and firing Kuhn and others.

_____

[1] This Opinion and Order supersedes and replaces the Court's previous Opinion and Order entered at ECF #64.

1

Kuhn now asserts that HCI (1) breached its contract with him and violated Michigan's Sales Representative Commissions Act, MCL § 600.2961 (the "SRCA") by failing to pay him sales commissions and other benefits and (2) discriminated against him based on his age in violation of Michigan law. Kuhn also seeks an accounting from HCI. (*See* First Am. Compl.*,* ECF #1-2.) Kuhn asserts the same claims against Defendant Sheakley HR, LLC ("Sheakley," and together with HCI, "Defendants"). Kuhn alleges that Sheakley is liable to the same extent as HCI because it acted as his "co-employer."

HCI and Sheakley have moved for summary judgment. (*See* ECF ##48, 49.) For the reasons explained below, the Court **GRANTS** Sheakley's Motion in its entirety and **GRANTS IN PART AND DENIES IN PART** HCI's Motion.

## FACTUAL BACKGROUND

**A.    HCI, Sheakley, and the Services Sheakley Provides HCI**

HCI sells televisions and other "patient education and entertainment systems" to healthcare facilities across the United States and Canada. (ECF #48-2 at 3, Pg. ID 768.) HCI also services and repairs the products it sells. (*Id.*)

Sheakley "does not manufacture, produce, import, sell, or distribute products in Michigan" or elsewhere. (Sheakley HR Consultant David Noe ("Noe") Declaration, ECF #49-3 at ¶4.) Instead, Sheakley provides "certain human resource and/or administrative services to its client companies." (*Id.* at ¶3.)

2

Sheakley provides two distinct and mutually exclusive administrative services to its clients. Which services Sheakley provides depends upon, among other things, the state in which Sheakley is providing the services In some states, Sheakley is registered as a "professional employer organization" ("PEO"), and in those states Sheakley co-employs its clients' employees. (*Id.* at ¶5.) Where Sheakley acts as a co-employer, applicants seeking a position with a Sheakley client "must complete Sheakley's employment process," and the "employees must be accepted and approved by Sheakley." (*Id.* at ¶5.)

In other states, Sheakley is not registered as a PEO, and it does not act as a co-employer. (*See id.* at ¶9.) In these states, Sheakley "operates as an administrative services organization" ("ASO"), and it provides "only administrative services, such as conducting employee background checks and distributing payroll as directed by" its clients. (*Id.* at ¶¶5, 9.)

Sheakley is not registered as a PEO in Michigan. (*See id.* at ¶9.) Thus, Sheakley does not act as the co-employer of any of its clients' Michigan-based employees. (*See id.*) More specifically, Sheakley did not act as the co-employer of any of HCI's Michigan-based employees. (*See id.*) Instead, Sheakley provided only ASO services to HCI's Michigan-based employees. (*See id.*)

## B.    HCI Hires Kuhn as a Regional Sales Manager

In May of 2012, Rick Margraf, HCI's Vice President of Sales ("Margraf"),

3

interviewed Kuhn and hired him as a Michigan-based regional sales manager.  (*See* Margraf Declaration, ECF #48-6 at ¶4; Kuhn Dep. at 67-68, Pg. ID 784.)   No Sheakley employee participated in the interview and hiring process.  (*See* Kuhn Dep. at 73, Pg. ID 786.)

On May 9, 2012, HCI sent Kuhn a letter that outlined its offer of employment.  (*See* the "May 9 Offer Letter," Exhibit A to ECF #48-6 at Pg. ID 823-824.)  Kuhn subsequently signed the May 9 Offer Letter and began working for HCI on May 21, 2012.  (*See id.*)  HCI assigned Kuhn to sell and service HCI products in Michigan, northwest Ohio, and Canada.  (*See* Margraf Dep. at 22-23, Pg. ID 805.)  For the Canadian territory, Kuhn worked with Richard Pratt ("Pratt") – HCI's Chief Executive Officer – who "managed" and was "in charge" of HCI's lone client in that territory, Hospitality Networks.  (*Id.* at 24, Pg. ID 805.)

As described in further detail below, the precise terms of Kuhn's employment with HCI, especially with respect to his compensation and right to sales commissions, are hotly disputed.

**C.    Kuhn Hears an Age-Related Comment at a Sales Meeting, but Does Not Know Who Made It and Does Not Complain About It**

In July or August 2012, Kuhn attended a national sales meeting at HCI's office in Cincinnati.  (*See* Kuhn Dep. at 49-50, Pg. ID 780.)  Kuhn says that during this meeting "[t]here were some comments made pertaining to computer ability based on the fact that a younger person [was] totally capable of … understanding

4

this much easier than [older] people …. [It was] an off-the-cuff remark like younger people get this much quicker than the older ones [do]." (*Id.* at 48-49, Pg. ID 779-780.)  Kuhn could not recall who made the comment, but he believed it was Pratt, who was approximately 57-years-old at that time. (*Id.* at 49-50, Pg. ID 780.)  Kuhn remembers that "everyone" (including Pratt) laughed when the comment was made, and Kuhn never reported or complained about the comment to anyone at HCI.  (*Id.*)

### D.  HCI Experiences a Slowdown in Sales, Reorganizes Its Sales Staff, and Eliminates Kuhn's Regional Sales Manager Position

HCI experienced a downturn in sales during the latter half of 2012. (Margraf Dep., ECF #48-5 at 41, Pg. ID 809.)  In order to "lower costs" and "increase sales," HCI decided in late 2012 to revamp its sales staff by eliminating the regional sales manager position. (Margraf Declaration, ECF #48-6 at ¶18; *See also* Magraff Dep. at 44-46, Pg. ID 809-810.)  Three regional sales managers, including Kuhn, were fired; three others resigned.  (*See id.* at 43-44, Pg. ID 809; *See also* Margraf Decl. at ¶¶19-21.)  As a result, HCI had no remaining regional sales managers. (*See* John Pratt Declaration, ECF #48-8 at ¶21.)  Kuhn's employment was formally terminated on January 18, 2013.  (Margraf Decl. at ¶20.)

HCI never hired a new employee to replace Kuhn.  "An independent consulting firm is now handling HCI's clients in Michigan and Ohio," and "HCI's Canadian client, [Hospitality Networks], continues to be serviced by [Rick] Pratt,

who generated sales and serviced [this] account both prior to and during Kuhn's employment."  (John Pratt Decl. at ¶¶22-23.)

## PROCEDURAL HISTORY

Kuhn originally filed this action in the Wayne County Circuit Court. On May 16, 2013, Kuhn filed a First Amended Complaint in that court.  (*See* First. Am. Compl., ECF #1-2.)  Defendants removed the action to this Court on June 17, 2013. (*See* Notice of Removal, ECF #1.)

The First Amended Complaint asserts four claims against both HCI and Sheakley.  In Count I, entitled "Loss of Sales and/or Commissions," Kuhn seeks allegedly unpaid sales commissions plus double damages and attorneys fees under the SCRA. (*See* First Am. Compl. at ¶¶12-13.)  In Count II, entitled "Breach of Contract," Kuhn alleges that he "had a contract for commission sales amounts" and that "Defendants' conduct [in refusing to pay him the commissions he believes he is owed] … constitutes a breach of the contract between the parties…" and violates the SCRA.  (*Id.* at ¶¶15, 19.)  In Count III, Kuhn alleges that the Defendants violated Michigan's Elliott-Larsen Civil Rights Act, MCL § 37.2101 *et seq*. (the "ELCRA"), by discriminating and/or retaliating against him because of his age. (*See id.* at ¶¶20-27.)  Finally, in Count IV, Kuhn demands the equitable remedy of an accounting.  (*See id.* at ¶29.)

Defendants have both moved for summary judgment.  (*See* HCI Motion. and Brief at ECF #48; *see also* Sheakley Mot. and Br. at ECF #49.)  The Court heard oral argument on Defendants' motions on July 21, 2013.

### GOVERNING LEGAL STANDARD

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson,* 477 U.S. at 252.  However, summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252.  Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

**A.    Sheakley is Entitled to Summary Judgment on All Counts of Kuhn's First Amended Complaint**

> **1.    Kuhn's Claims Against Sheakley for Unpaid Sales Commissions Fail Because Sheakley Was Not Obligated to Pay Commissions to Kuhn**

In Counts I and II of the First Amended Complaint, Kuhn alleges that Sheakly breached its obligation to pay him sales commissions.  But Sheakley had no such obligation, and thus it is entitled to summary judgment on Kuhn's claims for unpaid commissions.

To begin, Sheakley was not a party to any contract with Kuhn, and thus it had no *contractual* obligation to pay him sales commissions.  Under settled Michigan law, "[b]efore a contract can be completed, there must be an offer and acceptance." *Kloian v. Domino's Pizza, L.L.C.*, 273 Mich. App. 449, 452, 733 N.W.2d 766 (2007).  "Further, a contract requires mutual assent or a meeting of the minds on all the essential terms." *Id.*  Here, Kuhn never formed a contract with Sheakley because Sheakley never made him an offer, he never accepted its offer, and he reached no meeting of the minds with Sheakley.  As Kuhn candidly admitted: "I know nobody at Sheakley [] and have no idea who they are…"  (Kuhn Dep. at 46, Pg. ID 779.)  That comes as no surprise because nobody at Sheakley "participated in [Kuhn's] interview" with HCI, "told [him] what tasks to perform…," or gave him "performance evaluations or appraisals."  (*Id.* at 73-74,

8

Pg. ID 786.)  Indeed, the relationship between Kuhn and Sheakley bore none of the traditional hallmarks of a contractual employer-employee relationship.  As David Noe, a consultant employed by Sheakley's parent company succinctly explained in his sworn declaration:

> Sheakley did not employ Keith Kuhn.  Nor did it make any decision to hire, supervise or discipline him.  It also did not make any decisions regarding the calculation of his commissions, or make the decision to terminate his employment.  Rather, Sheakley primarily conducted Mr. Kuhn's background check, processed his benefits election paperwork, and issued payroll checks to Mr. Kuhn based on direction from HCI. (Noe Decl. at ¶14.)

In addition to alleging that Sheakley is contractually liable for unpaid commissions, Kuhn appears to claim that Sheakley owes unpaid commissions pursuant to the procuring-cause doctrine. (*See* First Am. Compl. at Count I.)  This "doctrine applies *when the parties have a contract governing the payment of sales commissions*, but the contract is silent regarding the payment of posttermination commissions." *KBD & Associates, Inc. v. Great Lakes Foam Technologies, Inc.*, 295 Mich. App. 666, 673, 816 N.W.2d 464 (2012) (emphasis added).  Here, the lack of a contract between Sheakley and Kuhn is fatal to any claim by Kuhn under the procuring-cause doctrine.  Moreover, Kuhn did not procure any orders for Sheakley, and that is yet another reason Sheakley has no liability under this theory.

Kuhn may also allege (it is far from clear) that Sheakley is liable for unpaid commissions under an unjust enrichment theory.  (*See* First Am. Compl. at Count

9

I.)  But there is no evidence that Sheakley was enriched in any way by the sales orders Kuhn claims to have secured for HCI.

Kuhn additionally appears to allege that Sheakley is liable under the SCRA. (See First Am. Compl. at Count II.)  However, Kuhn has not even attempted to rebut Sheakley's showing that it does not fall within the Act's definition of "principal' and that it is thus not covered by the Act.

Kuhn's primary argument that Sheakley is liable for unpaid commissions rests upon his allegation that Sheakley was his co-employer.  (*See* Kuhn Br. at 24-25, Pg. ID 1126-1127.)  But the evidence says otherwise.  Most importantly, as noted above, there is no evidence that Sheakley offered to serve as Kuhn's co-employer nor that Kuhn ever accepted an offer by Sheakley to serve in that capacity.  Simply put, there is no contract that makes Sheakley Kuhn's co-employer.

Kuhn's efforts to convert Sheakley into his co-employer fail.  At his deposition, Kuhn testified that his "contract makes [Sheakley] a co-employer." (Kuhn Dep. at 45, Pg. ID 996.)  However, the "contract" Kuhn mentioned was the May 9 Offer Letter in which HCI "extend[ed] an offer of employment *with HCI* as Regional Sales Manager…" (May 9 Offer Letter at 1, Pg. ID 823; emphasis added.)  As Kuhn himself later conceded, "[t]here is nothing in [the May 9 Offer Letter] that says Sheakley is a co-employer."  (Kuhn Dep. at 56, Pg. ID 998.)

10

Kuhn further argues that Sheakley is his co-employer because he received an employee manual "that says Sheakley HR is a co-employer." (*Id.*)  In support of this argument, Kuhn relies upon a Sheakley employee manual that he attached as an exhibit to his summary judgment response brief. (*See* ECF #52-8.)  However, there is no evidence in the record as to who gave this manual to Kuhn; when it was given to Kuhn[2]; whether Sheakley, in fact, agreed that the terms of that manual would apply to its relationship with Kuhn; nor even whether Kuhn accepted the terms of the manual. There are also serious questions as to the manual's authenticity that Kuhn has failed to answer.[3]

Finally, even if Kuhn had authenticated the manual, given its express language, the manual did not obligate Sheakley to pay him commissions.  The manual expressly provides that it "does not in any way constitute a contract" and

---

[2] In his brief opposing Sheakley's Motion, Kuhn asserts for the first time that the manual was "distributed to [him] at the time of hire." (Kuhn's Br. at 24, Pg. ID 1126.)  Kuhn cites no evidence for that proposition.  As stated above, the only manual Kuhn testified that he received at the time he was hired was an HCI employee handbook. (*See* Kuhn Dep. at 66-67, Pg. ID 1001.)

[3] As noted above, Kuhn attached the manual to his summary judgment response brief as Exhibit H, but he made no effort to authenticate that exhibit.  The record does not contain an affidavit or any deposition testimony confirming that Exhibit H is, in fact, the version of the manual mentioning Sheakley that Kuhn testified he received.  Notably, when questioned at his deposition, Kuhn acknowledged receiving an HCI employee handbook that *never* mentions Sheakley, much less identifies it as Kuhn's co-employer. (Kuhn's Dep. at 66-67, Pg. ID 1001; *See also* ECF #48-2.)  The handbook that does *not* mention Sheakley is the only authenticated handbook in the record.

that it is provided for "guidance" only. (*See* ECF #52-8 at 5, Pg. ID 1548.)  Given this clear disclaimer, the manual does not confer upon Kuhn any enforceable rights against Sheakley – as Kuhn's alleged co-employer or otherwise. *See Lytle v. Malady*, 458 Mich. 153, 169, 579 N.W.2d 906 (1998) (reaffirming that "provisions in a handbook will not create enforceable rights when the handbook expressly states that such provisions are not intended to create an employment contract"); *Highstone v. Westin Eng'ing, Inc*., 187 F.3d 548, 552 (6th Cir. 1999) (applying *Lytle* and finding no contractual obligation where employee manual states that "[i]t is not a contract with any employee").   All of this is fatal to Kuhn's argument that the manual somehow imposed upon Sheakley an obligation to pay sales commissions to Kuhn.

In sum, the evidence conclusively establishes that Sheakley had no obligation to pay commissions to Kuhn.  The Court therefore grants summary judgment in favor of Sheakley on Counts I and II of his First Amended Complaint.

## 2.   As Kuhn Has Now Properly Conceded, Sheakley is Entitled to Summary Judgment on His Employment Discrimination Claim

There is absolutely no evidence in this record that Sheakley committed, or is responsible for, any age discrimination against Kuhn.  Thus, as Kuhn properly conceded at the hearing before the Court, Sheakley is entitled to summary judgment on Kuhn's employment discrimination claim (Count III of his First Amended Complaint).

12

### 3. Sheakley is Entitled to Summary Judgment on Kuhn's Demand for an Accounting

As explained in detail above, Sheakley had no contractual relationship with Kuhn, and Kuhn never engaged in any sales of any products or services for Sheakley. Moreover, there is no evidence in the record that Sheakley maintains any records (concerning the HCI sales that form the basis of Kuhn's commission claims) from which Kuhn's requested accounting could be performed. For those reasons, and for all of the reasons stated below with respect to HCI (*see* pp. 20-21), Kuhn is not entitled to an accounting from Sheakley. The Court therefore grants Sheakley summary judgment as to Count IV of Kuhn's First Amended Complaint.

## B. HCI is Not Entitled to Summary Judgment on Counts I and II of Kuhn's First Amended Complaint, But is Entitled to Summary Judgment on Counts III and IV

### 1. HCI is Not Entitled to Summary Judgment on Counts I and II of Kuhn's First Amended Complaint Because There are Material Factual Disputes as to the Terms of Kuhn's Employment with HCI and the Amount of Commissions Kuhn is Owed

HCI argues that it is entitled to summary judgment on Counts I and II of the First Amended Complaint – in which Kuhn seeks to recover for unpaid sales commissions – because "(1) [Kuhn] cannot establish the existence of a contract for commissions between him and HCI and, (2) assuming that he could, HCI actually paid him more commissions than he was eligible for, rather than less." (HCI Mot. and Br. at 29, Pg. ID 743.)

However, there are several material factual disputes with respect to both of Kuhn's claims for unpaid commissions.  These disputes include the following:

1. <u>Whether the parties have an enforceable contract</u>.  HCI points to language in the May 9 Offer Letter disclaiming the existence of a contract (*see* the May 9 Offer Letter, Pg ID. 823) and argues that in light of that language, the parties did not have a binding sales commission contract. (*See* HCI Mot. and Br. at 30-31, Pg. ID 744-745.)  Kuhn counters with his sworn deposition testimony recounting his communications with HCI concerning the terms on which he would be paid and express promises made to him concerning the payment of commissions. (*See* Kuhn Dep. at 87, 98, Pg. ID 1222, 1232.) This conflicting evidence precludes summary judgment on the question of whether the parties had an enforceable contract.

2. <u>The payment terms of the contract.</u>  Citing certain deposition testimony and sworn declarations, HCI argues that Kuhn is entitled to commissions on a particular sale if and only if three precise conditions are met. (*See* HCI Mot. and Br. at 20-22, Pg. ID 745-747; *see also* John Pratt Decl. at ¶8)  Kuhn has testified under oath that pursuant to his agreement with HCI, he was entitled to commissions under *at least* one other condition. (*See, e.g.,* Kuhn Dep. at 96-97, Pg. ID 1231-1232). Kuhn's testimony and

14

affidavit statements concerning the calculation of his commissions (*see* Kuhn Supplemental Affidavit, ECF #52-31) sharply differ from HCI's view as to how the commissions should be calculated. The conflicting evidence on the commission calculation issue further precludes summary judgment on Counts I and II.

3. <u>Whether HCI breached the contract or otherwise failed to pay commissions owed to Kuhn</u>. HCI has submitted calculations by its employees showing that it has overpaid commissions to Kuhn. (*See* John Pratt Decl. at ¶¶13-17.) Kuhn has countered with a calculation showing that HCI underpaid him by at least $50,000. (*See* ECF #52-31.) In addition, there is a dispute between the parties as to whether Kuhn procured certain orders and is thus entitled to a commission on them (under the procuring-cause doctrine or otherwise). (*See id.*; *See also* Mr. Kuhn Dep. at 99-102, Pg. ID 1234-1237.) These disputes are a further bar to summary judgment on Counts I and II.

On this record, there are material factual disputes concerning which terms, if any, the parties intended to govern Kuhn's compensation and the amount of unpaid commissions, if any, to which he is entitled. For that reason (and the reasons explained above), HCI is not entitled to summary judgment on Counts I or II of Kuhn's First Amended Complaint. *See Terry Barr Sales Agency, Inc. v. All-Lock*

*Co., Inc.*, 96 F.3d 174, 179 (6th Cir. 1996) (reversing grant of summary judgment for employer in sales commission dispute and finding that while "summary judgment may be appropriate when the documents and/or evidence underlying the contract are undisputed and there is no question as to intent… disputed issues of contractual intent are considered to be factual issues which preclude an award of summary judgment").

> **2.    There is No Material Factual Dispute as to Whether HCI Engaged in Age Discrimination and HCI is Therefore Entitled to Summary Judgment as to Count III of Kuhn's First Amended Complaint**

In Count III of his First Amended Complaint, Kuhn alleges that HCI violated the ELCRA by discriminating against him because of his age. [4]  Kuhn addressed this claim in only two sentences in his twenty-four page response brief: "Finally, Kuhn describes the age discriminatory statements made by his supervisor at pages 41, 48-49 [of his deposition].  In addition, pages 82-83 he [sic] outlines that he was replaced by John Pratt approximately 30 years old, some 20 plus years

---

[4] Kuhn's First Amended Complaint brings forth an action for "[a]ge discrimination and/or retaliation."  (*See* First. Am. Compl. at ¶¶ 14-19.)  Kuhn, however, admitted that he never lodged a complaint of age discrimination prior to his termination (*see* Kuhn's Dep. at 42, 45, Pg. ID 778-779) and he has failed to otherwise explain how his discharge was in any way retaliatory.  In fact, Kuhn did not respond at all to HCI's argument that no retaliation claim can exist on these facts.  (*See* HCI Mot. and Br. at 28-29, Pg. ID 742-743.)   The Court therefore finds Kuhn has conceded HCI's argument on this issue.  *See Jewel v. Chrysler, LLC*, 2014 WL 764660 at *4 (E.D. Mich. Feb. 25, 2014) (internal quotation marks omitted) ("When a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded").

Kuhn's junior."  (Kuhn Br. at 17-18, Pg. ID 1119-1120.)  Kuhn spends little time addressing his age discrimination claim with good reason: it cannot withstand HCI's motion for summary judgment on this record.

A plaintiff may rely on either direct or indirect evidence to establish an age discrimination claim under the ELCRA.  *See Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).  Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor" in an adverse employment action.  *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (noting in the context of the Americans with Disabilities Act, which also borrows the same standards the Court applies here, that direct evidence "would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled'").

A plaintiff who lacks direct evidence of discrimination may rely on indirect or circumstantial evidence.  *See Laster*, 746 F.3d at 726.  Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to establish a prima facie case of discrimination under the ELCRA, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated

individual outside of his protected class.  *See Laster*, 746 F.3d at 727.  "If [a] termination arises as part of a work force reduction, [the United States Court of Appeals for the Sixth Circuit] has modified the fourth element to require the plaintiff to provide additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."  *Geiger v. Tower Automotive*, 579 F.3d 614, 622 (6th Cir. 2009) (internal quotation marks omitted).

Kuhn has not presented any direct evidence that HCI discriminated against him based upon his age.  The *only* evidence of discrimination Kuhn has identified is an "off-the-cuff remark" that an unidentified person made at an HCI sales meeting that "younger people get this [i.e. computers] much quicker than the older ones [do]."  (Kuhn Dep. at 48-49, Pg. ID 779-780.)  Even if, as Kuhn believes, the statement was made by Richard Pratt, HCI's CEO, this one isolated remark, made in jest, to a room full of HCI employees, by a person older than Kuhn, is not direct evidence that, more than six months later, HCI discriminated against Kuhn due to his age when Margraf – who also is older than Kuhn – decided to fire him.  *See Oliver v. Federated Mut. Ins. Co.*, 341 Fed. App'x 108, 110 (6th Cir. 2009) (finding no direct evidence of discrimination because "isolated statement that '[y]ou know, old guys like us, you and me, we can't type as fast as those younger guys,' was not part of the decisional process and was unconnected in time and

context to [plaintiff's] termination").

Nor has Kuhn satisfied his burden of establishing a prima facie case of age discrimination.  In this case, HCI has presented persuasive evidence that, due to a slowdown in sales, it eliminated several regional sales manager positions and that all of its regional sales managers, not just Kuhn, either were fired or resigned from the company.  (*See, e.g.,* Margraf Dep. at 43-44, Pg. ID 809; *See also* Margraf Decl. at ¶¶19-21.)  In fact, even Margraf, Kuhn's boss (and Vice President of Sales), resigned from HCI due to slow sales.  (Margraf Decl. at ¶21.)  Given the clear evidence that HCI conducted a reduction in force,[5] Kuhn must establish as part of his prima facie case that he was "singled out" for "impermissible reasons." *Geiger*, 579 F.3d at 622.  Kuhn has failed to do so.  As noted above, apart from one isolated and innocuous age-related comment, Kuhn has not presented *any* evidence that HCI ever considered his age (or anyone else's) in any way.

---

[5] At oral argument, Kuhn suggested that HCI did not conduct a reduction in force because when HCI terminated him, it replaced him on the Hospitality Networks account.  However, a "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties," *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990), and that is what happened here.  HCI did not hire a new account manager to take on Kuhn's responsibilities.  Rather, HCI's CEO, Richard Pratt, assumed Kuhn's responsibilities related to the Hospitality Networks account. (John Pratt Decl. at ¶23.)   Because Richard Pratt absorbed Kuhn's responsibilities for the Hospitality Networks account and continued to perform his responsibilities as CEO, as a matter of law, HCI did not replace Kuhn on that account. *See Geiger*, 579 F.3d at 623 (employee not replaced where other employee absorbed that employee's duties and continued to perform his own duties).

Moreover, Kuhn has even failed to establish that he was replaced by someone outside his protected class.  While Kuhn testified at his deposition that, based upon hearsay reports, he "believed" 32 year-old John Pratt serviced the Hospitality Networks account following his (Kuhn's) discharge (Kuhn Dep. at 83, 162-63, Pg. ID 1218, 1297-98), the unrebutted admissible evidence establishes that Richard Pratt, HCI's CEO who is *older* than Kuhn (Kuhn Dep. at 50-51, Pg ID 1184-85), *not* John Pratt, actually serviced the Hospitality Networks account following Kuhn's departure. (John Pratt Decl. at ¶23.)

Finally, even if Kuhn had established a prima facie case of age discrimination (and he has not), his discrimination claim would still fail because he has not shown that HCI's stated legitimate and non-discriminatory reason for his discharge – the need to reduce its work force – was a pretext for age discrimination. *See Geiger*, 579 F.3d at 626.

Therefore, for all of the reasons stated above, HCI is entitled to summary judgment on Count III of Kuhn's First Amended Complaint.

### 3.    Kuhn is Not Entitled to an Accounting From HCI

In Count IV of his First Amended Complaint, Kuhn seeks an accounting from HCI.  (*See* First Am. Compl. at ¶29.)  But under long-standing Michigan law, an accounting is an equitable remedy available only where a plaintiff lacks an adequate remedy at law.  *See Basinger v. Provident Life & Accident Ins.*, 67 Mich.

20

App. 1 (1976); *Burke v. Eddy & Co.,* 332 Mich. 300 (1952).  Here, Kuhn has an adequate remedy at law through his breach of contract claim and his request for damages under the SCRA.  Kuhn therefore has no grounds to seek an accounting. The Court therefore grants HCI summary judgment as to Count IV of Kuhn's First Amended Complaint.

## CONCLUSION

For all of the reasons started above, the Court **GRANTS** Sheakley's Motion for Summary Judgment (ECF #49) in its entirety.  The Court further **GRANTS** HCI's Motion for Summary Judgment (ECF #48) as to Counts III and IV of Kuhn's First Amended Complaint and **DENIES** HCI's Motion as to Counts I and II.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 6, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 6, 2014, by electronic means and/or ordinary mail.

s/Julie Owens
Case Manager
(313) 234-5137